Argued and submitted June 3, affirmed July 17, Starr's reconsideration and Benton County's reconsideration denied September 13, both petitions for review denied November 26, 1985 (300 Or 322)

GORACKE et al,
*Respondents,*

*v.*

BENTON COUNTY,
*Petitioners.*

(84-100; CA A35607)

703 P2d 1000

Richard T. Ligon, Benton County Counsel, Corvallis, argued the cause and filed the brief for petitioner Benton County.

Peter L. Barnhisel, Corvallis, argued the cause for petitioner Stanley Starr. With him on the brief was Fenner, Barnhisel, Willis & Barlow, Corvallis.

Richard P. Benner, Portland, argued the cause and filed the brief for respondents.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

Petitioners[1] seek review of an order of the Land Use Board of Appeals that reversed and remanded the county's decision approving a minor partition of an 80-acre parcel of land. We affirm.

The parcel in question is zoned for exclusive farm use and is presently used for growing wheat. Petitioner Starr applied for a partition of the property into two 40-acre parcels so that he could sell the east 40 acres to raise capital for the planting of a filbert orchard on the west 40 acres. The county approved the partition. On review by LUBA and pursuant to LCDC's direction, the case was remanded to the county for reconsideration of the application of Goal 3 under the balancing test established by LCDC and articulated in LUBA's order.

Petitioners Starr and Benton County appealed to this court. We reversed and remanded the case to LUBA, because its order was internally inconsistent in articulating the test enunciated by LCDC and included in part of LUBA's order.[2] *Goracke v. Benton County,* 68 Or App 83, 683 P2d 106 (1984). On remand, LUBA clarified its order by re-articulating the LCDC test for reviewing land partitions under Goal 3, which requires that "minimum lot sizes * * * utilized for any farm use zones shall be appropriate for the continuation of the existing commercial agricultural enterprise in the area":[3]

> "The creation of lots smaller than entire commercial farm units is permissible where, as here, (1) the area's commercial agricultural enterprise consists of farm units made up of non-contiguous parcels of diverse size, rather than single, large tracts and (2) given the nature of the agricultural enterprise, the proposed lots are of sufficient size to be profitably farmed as parts of larger operations. However, if there is credible

---

[1] We refer to the parties by their designations in this court.

[2] Other parts of LUBA's order indicated that if the partition would result in *any* harm to the agricultural enterprise, no matter how small or speculative, it did not meet the requirements of LCDC's interpretive rule. OAR 660-05-015.

[3] Section IV.06 of the county's zoning ordinance, acknowledged on February 22, 1984, provides:

> "A(1) Any proposed parcel intended for farm use must comply with ORS 215.234 and must be appropriate for the continuation of existing commercial agricultural enterprise in the area."

evidence in such cases that the size of the proposed lots is detrimental to commercial agriculture in the area, the county must demonstrate that the benefits to the area's agricultural economy outweigh the negative impacts. * * *"

LUBA stated that respondents had presented evidence that the land division would result in (1) reduced grain production for the current tenant; (2) reduced efficiency in farming; and (3) higher land prices per acre, resulting in reduced land availability for farming. It then discussed the application of its test:

"* * * The debate centers on whether the county has adequately responded to the evidence of negative impacts introduced by opponents of the land division. We conclude it has not.

"As noted by LCDC and the county itself, the evidence that creation of 40 acre parcels will have negative impacts on the area's agricultural economy is credible. The evidence was provided by experienced farmers as well as by other experts. Respondents answer by pointing out that 40 acre field sizes are common in the area and that there is evidence both proposed parcels will be commercially farmed (i.e., there are 'commercially viable' proposals for both lots). However, this does not adequately respond to the question at issue. Neither the county ordinance, the state goal, nor LCDC's interpretive rule authorize continuation of a field size or lotting pattern having negative impacts on commercial agriculture merely because the pattern already exists or because the interests of individuals might be served by the proposal. Such considerations and interests must give way to the broader objective embodied by the lot size standard—support and continuation of the area's commercial agricultural enterprise. (Citations omitted.)

"We conclude [that] the county has not adequately demonstrated why, in light of the proof of negative impacts offered by opponents of the partition, the land division remains appropriate for the continuation of the commercial agricultural enterprise in the area. Accordingly, the challenged decision must be remanded."

On remand, the Board of County Commissioners reconvened for the purpose of taking evidence on the harm and benefits of the proposed partition. After weighing the evidence, the county found that none of the evidence of harm offered by respondents proved the existence of harm with

respect to this particular parcel. It found that the only possible increased harm from the partition would be the increased price per acre of the two smaller parcels, but that no evidence had been presented regarding what that increase would be with respect to the subject property and that any increase in price would be minimal. It also found that filberts were more profitable than wheat and that, for that reason, there was a greater likelihood that the parcel would continue to be farmed if the partition were allowed. Relying on those factors, the county concluded that the benefits of the partition would outweigh any possible negative impacts; it then approved the partition.

LUBA once again reviewed the county's decision and determined that the county had not correctly applied the test for the partition of agricultural land. It reiterated its earlier determination that there is credible evidence of harm in the record and that, therefore, the county was required to apply a balancing test and to demonstrate that the benefits to commercial agriculture in the area outweigh the negative impacts that would result from the partition. It stated that the only benefits cited by the county were derived from the greater profitability of filberts and the greater likelihood that the parcel would be farmed if it were partitioned. Yet the record shows, as LUBA pointed out, that it was not necessary to partition the parcel in order to establish a filbert crop. Accordingly, LUBA concluded that there had been no showing that the partition would be beneficial to the agricultural economy.

Both petitioners argue here that, in making a finding that there was credible evidence of harm, LUBA has exceeded its scope of review under ORS 197.830(11) by substituting its judgment for that of the county on a question of fact supported by substantial evidence. That contention, however, is founded on a misunderstanding of the balancing test.[4] LUBA stated that a balancing of the negative impacts and benefits of the partition is required if there is credible evidence that the partition will cause harm to the agricultural economy. Credible evidence of harm is any evidence from which a reasonable factfinder may find harm or a negative impact. Here, the

---

[4] Petitioners do not challenge the validity of the test itself.

county acknowledged the evidence showing a negative impact to the extent that the market value of the land in smaller parcels would be greater, but concluded that it would be minimal.[5] If any credible evidence is presented from which a finding of harm could be made, then the county is required to weigh the negative impacts and benefits of the partition. For that reason, LUBA, in its decision now before us, stated:

> "The petitioners' concern about substantial evidence is somewhat misplaced. In *Goracke I,* we stated that if *credible* evidence exists to show harm to agriculture within an area, the county is obliged to show how that harm is outweighed by the benefits to agriculture resulting from the partitioning. In *Goracke I,* we found credible evidence of harm to exist. We have seen nothing in the county's findings in this case to suggest that our conclusion about harm was mistaken." (Emphasis in original.)

■     Although it purported to do the balancing, the benefits cited by the county would not be a consequence of the partition itself, but would be a result of the planting of filbert trees on the west 40 acres. As LUBA pointed out, the planting of filbert trees is feasible without a partition of the land, although petitioner Starr will not plant filberts without the partition, because he needs the proceeds from the sale of the east 40 acres in order to do so. Therefore, the benefits of growing filberts are not a direct result of the partition. LUBA did not err in holding that petitioners have not shown benefits attributable to the partition itself.

In its petition, Benton County contends further that LUBA unlawfully required petitioners to demonstrate a "need" for the partition, even though the county's ordinance and LUBA's balancing test do not impose such a requirement. That contention begs the question. LUBA has not established a requirement of "need." The balancing test requires a showing of *benefits* from the partition if there is evidence from which a finding of harm could be made. LUBA recognized, as

---

[5] There is evidence that in 1982, when comparisons were made, farm parcels of approximately 80 acres sold for $2,500 an acre and that those of approximately 40 acres sold for $3,200 to $3,300 an acre. The inverse correlation of the price per acre to the parcel size is explained by the increased demand for rural land by those interested in its amenity value rather than its production value as agricultural land. By dividing large parcels into smaller ones, that demand may be met.

the record reflects, that the land does not have to be partitioned for the growing of filberts. LUBA therefore reasoned that the growing of filberts is not a benefit of the partition itself—rather, it is a result of petitioner Starr's desire to grow filberts only if the land is partitioned. LUBA did not require, in the abstract, a showing of need.

The county's third assignment is that the effect of LUBA's decision is to establish improperly a policy that new crops cannot be introduced into an area of grain or grass seed farms. The decision does not do that; the language quoted by the county is taken out of context. In discussing whether petitioners had shown that the partition would benefit the agricultural economy, LUBA stated that the growing of filberts and increased profits from filberts were not benefits of the partition, because partitioning was not required to establish a filbert crop. It went on to point out that the partition of the land for the purpose of growing filberts would result in less acreage being available for grass seed growing. The language complained of does not purport to say that new crops may not be introduced; it merely illustrates the error of considering the growing of filberts as a benefit of the proposed partition.

As a part of its third assignment, the county also contends that LUBA's decision establishes a policy prohibiting partitions in exclusive farm use zones which have no minimum lot size, because the harms cited by LUBA in this case would occur whenever land is partitioned. That contention ignores the balancing process required to effect a partition of agricultural land—if there are benefits that outweigh the negative impact, partition may be approved. Here, LUBA concluded that petitioners had not shown that there were benefits from the partition, and the record supports that finding.

Affirmed.